IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ASHOK V. SHAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civ. No. 07-554-SLR | |
| | ) | |
| BANK OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

Ashok V. Shah, New Castle, Delaware, pro se Plaintiff.

Sheldon N. Sandler and Margaret M. DiBianca, Esquires, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, and Elena D. Marcuss, Esquire, McGuire Woods LLP, Baltimore, Maryland.  Counsel for Defendant.

## MEMORANDUM OPINION

Dated: February 18 , 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Askok V. Shah ("plaintiff"), proceeding pro se, filed suit in the Superior Court of the State of Delaware against Bank of America ("defendant") alleging employment discrimination. (D.I. 1)  On September 17, 2007, defendant removed the case to this court. (*Id.*)  Presently before the court is defendant's motion for summary judgment and motion for order, plaintiff's response, and defendant's reply. (D.I. 17, 18, 19, 20, 23, 24) For the reasons set forth below, the court will grant defendant's motion for summary judgment and will deny as moot the motion for order. (D.I. 17, 20)

## II. BACKGROUND

Adecco, a temporary staffing agency, placed plaintiff in a temporary work assignment with its client, defendant Bank of America, after Dawn M. C. Weaver ("Weaver"), group operations manager for Banc of America Card Service Corporation, contacted it to obtain temporary assistance for a special project.[1]  (D.I. 19, A41-42, A114, A116, A124)  The assignment was scheduled to begin December 4, 2006 and was to conclude on December 29, 2006. (*Id.* at A124)  Adecco advised plaintiff of his rate of pay and instructed plaintiff to report his hours for pay to Adecco using an automated system. (D.I. 14; D.I. 19, A28)  Plaintiff had previously worked as a temporary employee in 1997 and 1999 on different special projects for defendant when it was known as MBNA.[2]  (D.I. 19, A1-8, A118, A120)

---

[1]Banc of America Card Service Corporation is a subsidiary of defendant and formerly a part of MBNA.  (D.I. 19, A114)

[2]Bank of America and MBNA entered a merger agreement.  On January 1, 2006, Bank of America acquired one hundred percent of MBNA's outstanding stock. www.bankofamerica.com/annualreport/2005.

During previous assignments, plaintiff became friendly with Nancy Pignitore Weeks ("Weeks") and they developed a personal relationship that ended in August 2001.³ (*Id.* at A120) Once the relationship ended, Weeks asked plaintiff to stop bothering her, but he continued to call Weeks at her home and cell telephone numbers and would drive by her home. (*Id.*) Weeks was frightened of plaintiff and only felt safe at work. (*Id.*) Despite Weeks' repeated requests, plaintiff continued to call Weeks at work and on her cell phone. (*Id.* at A120) She ultimately reported the situation to her senior manager, Wendy Lindsey ("Lindsey"), who contacted MBNA Security. (*Id.* at A120, 122) Later, an individual from MBNA's Threat Management group contacted Weeks and she explained the situation to that person. (A120, A122) The record contains an MBNA incident report, dated October 10, 2001, regarding Weeks' receiving annoying, but not threatening, telephone calls at her desk. (D.I. 19, A21)

Plaintiff testified that, in 1999 and continuing after his assignment ended with defendant, Weeks asked her to call him. (*Id.* at A73-74, A79) Plaintiff further testified that defendant knew that Weeks' complaints about him were dishonest. (*Id.* at A79) He now claims that he was harassed by Weeks from 1999 to the present but, during his deposition and in a complaint he filed against Weeks in State court, he indicated that he never reported harassment to defendant or the police.⁴ (*Id.* at A38, A101)

On the morning of December 4, 2006, plaintiff reported to defendant's facility for his temporary assignment. (*Id.* at A40-41) It lasted approximately four hours. (*Id.* at

---

³Her name at the time was Nancy Pignitore. She is now known as Nancy Weeks.

⁴The Superior Court dismissed the case. (D.I. 19, A59)

A28) That morning, he met with Operations Manager Linda Durso ("Durso"). (*Id.* at A41-43, A116) Durso reports to Weaver. (*Id.* at A42-43, A116) Durso introduced plaintiff to some of the associates present at the time. (*Id.* at A42-43) Peggy Keen ("Keen"), a temporary employee, previously had worked with Weeks and Lindsey, and recognized plaintiff when she saw him. (*Id.* at A118) Based upon what she knew about the problems between plaintiff and Weeks, Keen believed that Weeks would be upset if she saw plaintiff. (*Id.*) Weeks was not present at work that day and did not know plaintiff had been at the work site until two days later. (*Id.* at A118, A121) Keen called Lindsey, who no longer worked in the same area. (*Id.* at A118, A122) In turn, Lindsey contacted Jennifer Buchanan ("Buchanan"), the manager in Weeks' area. (*Id.* at A122) Buchanan contacted Durso, who provided the information to her supervisor, Weaver. (*Id.* at A116, 122-23)

At this juncture, Weaver spoke first with Lindsey and, then, with a personnel generalist who advised her that defendant had no obligation to retain plaintiff. (*Id.* at A114) It was recommended that Weaver contact Adecco to advise it that, effective immediately, plaintiff's services were no longer needed. (*Id.*) Weaver terminated plaintiff's temporary assignment since it would have involved him working in the same area as Weeks. (*Id.* at A115) Weaver had never met plaintiff and was unaware of his national origin and race. (*Id.* at A115) Weaver instructed Durso to contact Lisa Pisano ("Pisano"), the Adecco representative, and have Pisano inform plaintiff that his temporary assignment was ending. (*Id.* at A45, A116) Durso escorted plaintiff to the building entrance following his conversation with Pisano. (*Id.*) At the time, Pisano did not give plaintiff any reason for the termination. (*Id.* at A48) At some point in time,

3

plaintiff was told that he was no longer eligible to work for defendant. (*Id.* at A49) His charge of discrimination alleges he was terminated because of a "bad reference." (D.I. 1, ex. 1) In this regard plaintiff testified that, in the past, he received very high reviews from defendant, and was told by Adecco's predecessor company of the favorable reviews. (D.I. 19, A80-A81)

The termination of plaintiff's assignment with defendant did not affect his ability to obtain further assignments from Adecco. (*Id.* at A124) He has been maintained by Adecco as eligible to work. (*Id.*)

Plaintiff filed a charge of discrimination against defendant on January 8, 2007 and received his right to sue letter on February 28, 2007. (D.I. 1, ex. 1) The record contains two charges of discrimination. One states that plaintiff was discharged based upon his national origin (i.e., India). (D.I. 19, A101) The other states that plaintiff was discharged based upon his race and national origin. (*Id.* at A102) Both charges state that the reason plaintiff was given for his discharge was that he was not eligible to work for defendant because of a "bad reference." (*Id.* at A101-102) Both charges identify, as applicable laws, Title VII of the Civil Rights Act, as amended ("Title VII") and the Delaware Discrimination in Employment Act ('DDEA').[5] (*Id.*) The charge of discrimination received by defendant referenced only discrimination based upon national origin. (*Id.* at A104-108)

Following his discharge, plaintiff sought unemployment benefits. (*Id.* at A22)

---

[5]Delaware law prohibits employment discrimination in terms almost identical to Title VII of the 1964 Civil Rights Act. *Schuster v. Derocili*, 775 A.2d 1029, 1033 (Del. 2001); *see also Cannon v. State of Delaware*, 523 F. Supp. 341, 344 (D. Del. 1981);19 Del. C. § 711; 42 U.S.C. § 2000e-2.

4

The unemployment notice of determination lists plaintiff's employer as Adecco. (Id.)
The Delaware Department of Labor's ("DOL") findings of fact state that plaintiff's
assignment ended as Adecco's client indicated that plaintiff could not work at a bank.
(Id.) Adecco did not provide information regarding the claim, and the DOL found plaintiff
eligible to receive unemployment benefits "as he was discharged without just cause in
connection with the work." (Id.)

Plaintiff seeks compensatory damages in excess of one million dollars and
punitive damages of three billion dollars. (Id.)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears
the burden of proving that no genuine issue of material fact exists. See Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). When
determining whether a genuine issue of material fact exists, the court must view the
evidence in the light most favorable to the nonmoving party and draw all reasonable
inferences in that party's favor. Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).
"Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence
exists from which a rational person could conclude that the position of the person with
the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life
Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving

5

party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). To survive a motion for summary judgment, plaintiff cannot rely merely on the unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Blozis v. Mellon Trust of Delaware Nat'l Ass'n*, 494 F. Supp. 2d 258, 267 (D. Del. 2007) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

Defendant moves for summary judgment on the grounds that plaintiff cannot establish that he was defendant's employee for the purposes of Title VII or the DDEA, cannot establish that he exhausted his administrative remedies, and cannot establish a prima facie case of discrimination or proffer any evidence of pretext.

6

## IV. DISCUSSION

### A. Employer

Title VII regulates the relationship between employers and employees.[6] As a result, in Title VII cases, the relevant question is whether defendant was plaintiff's employer under the statute. If defendant was an employer, as defined by the statute, it may be sued under Title VII. *Doe v. William Shapiro, Esq. P.C.*, 852 F. Supp. 1246, 1253 (E.D. Pa. 1994). Title VII authorizes a cause of action only against employers, employment agencies, labor organizations, and training programs. *See* 42 U.S.C. § 2000e-2.

When a statute containing the term "employee" does not define the term, or defines it in a completely circular fashion, the court should apply the common law definition. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-24 (1992).[7] In *Darden*, the Supreme Court set forth relevant factors to determine whether a hired party is an employee under the general common law of agency and considers the hiring party's right to control the manner and means by which the product is accomplished using the following factors: (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the

---

[6]The court will analyze the case under Title VII standards since it is virtually identical to the DDEA. *See* n.3, *supra.*

[7]*Darden* applies to Title VII cases. *See Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d 1, 11 (1st Cir. 2004) (applying the *Darden* rationale to Title VII because Title VII and ERISA contain the same definition of "employee").

7

hired party; (6) the extent of the hired party's discretion over when and how long to
work; (7) the method of payment; (8) the hired party's role in hiring and paying
assistants; (9) whether the work is part of the regular business of the hiring party; (10)
whether the hiring party is in business; (11) the provision of employee benefits; and (12)
the tax treatment of the hired party. *Darden,* 503 U.S. at 323-24 (citing *Community for
Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989)).

Regarding the issue of plaintiff's employer, the court does not determine whether
plaintiff is technically an employee of defendant, but instead must discern "the level of
control an organization asserts over an individual's access to employment and the
organization's power to deny such access." *Graves v. Lowery*, 117 F.3d 723, 728 (3d
Cir. 1997) (citing *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1342 (D.C. Cir. 1973)).
"[T]he precise contours of an employment relationship can only be established by a
careful factual inquiry." *Id.* at 729 (citation omitted).

Plaintiff did not address the employer issue and provided no evidence to refute
defendant's position that it is not his employer. It is evident from the record that plaintiff
was to perform his work at the defendant's place of business. His length of employment
with defendant, however, was only four hours, while it appears that he has an on-going
relationship with Adecco. Pisano's declaration states that Adecco has the right to
assign additional projects to plaintiff and that plaintiff has been maintained by Adecco as
eligible to work. Additionally, it was Adecco who assigned plaintiff's rate of pay, to
whom plaintiff reported his hours worked, and who paid plaintiff. Although defendant
decided it no longer needed plaintiff's services, it was Adecco who advised plaintiff that
his services were no longer needed. Finally, the record reflects that, following the

8

termination of his temporary assignment, plaintiff sought unemployment benefits from Adecco, not defendant.

In considering the *Darden* factors and the undisputed evidence, the court concludes that defendant is not the employer of plaintiff. For the above reasons, the court will grant defendant's motion for summary judgment on the employer issue. Alternatively, even if the court were to consider defendant as plaintiff's employer, as discussed below, plaintiff has failed to establish that he was discriminated against based upon his national origin or race.

### B. National Origin/Race Discrimination

Defendant asserts that (1) plaintiff is unable to establish a prima facie case of discrimination and (2) cannot establish that the reason given for the termination of the temporary assignment was a pretext for discrimination.[8] Plaintiff's response, belatedly filed, consists solely of argument. He refers to alleged acts of discrimination that occurred from 1997 to 2006, including submitting employment applications to defendant. The complaint, however, refers only to the December 4, 2006 termination and, similarly, his charge of discrimination refers only to the December 4, 2006 termination. Plaintiff is precluded from litigating issues not properly before the court and/or that he did not administratively exhaust. *See Robinson v. Dalton*, 107 F.3d 1018, 1020-21 (3d Cir. 1997).

The response also attacks the credibility of Weeks, plaintiff's former friend.

---

[8]Defendant also raises an exhaustion issue. As discussed, the record contains two charges of discrimination; one refers to race discrimination and the other does not. The court sees no need to address exhaustion inasmuch as summary judgment is proper on other grounds.

While "[s]ummary judgment is inappropriate when a case will turn on credibility determinations, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), "[i]t is by now axiomatic that 'a nonmoving party . . . cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect.'" *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998) (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). Finally, plaintiff attacks his treatment by defense counsel at the time of his deposition.

A plaintiff may prove national origin or race discrimination by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46 (1989), or indirectly through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Direct evidence" is evidence sufficient to allow the jury to find that "the decisionmakers placed substantial negative reliance on [national origin] in reaching their decision." *Price Waterhouse*, 490 U.S. at 277.

During his deposition, plaintiff discussed a litany of complaints to support his claim. He testified that Durso has been racist since 1997 and is against people from India. (D.I. 19, A54) His explanation of Durso's racism is that in 1997 and in 1999 she did not like it when he drank tea, did not offer him a seat or cake, was rude and unprofessional, and treated him differently from permanent employees. (*Id.* at A54, A83, A85-A87) Also, he indicated that when he worked for defendant in 1997, Durso terminated his position after either three weeks or three months. (*Id.* at A55-A56, A82) It is not clear from plaintiff's testimony what was the actual length of time. Plaintiff testified that in 1999 or 2000, Weeks told him a "couple of things about racial slurs." (D.I. 19, A35) Plaintiff opines that Lindsey knew that, at one time, Weeks sexually

harassed him. (*Id.* at A67) Finally, plaintiff testified that persons born in India are treated differently than those born in the United States. (Id. at A95, A98) He provided examples that defendant forces Indians to work the night shift, does not inquire about one's health, and a person born in India is asked to go home, while a person born in the United States is not. (*Id.* at A95)

While plaintiff provides numerous complaints, particularly about Durso and Weeks, his testimony does not establish that defendant's decisionmakers placed substantial negative reliance on his national origin or race in terminating the temporary position. The evidence before the court is that Durso was merely the messenger when she advised plaintiff he was no longer needed. Indeed, the decision to terminate the temporary position was made by Weaver who had never seen plaintiff and was unaware of his national origin or race. Moreover, plaintiff makes complaints about Durso's alleged discriminatory acts that occurred some six years prior to the 2006 termination. None of the acts are directly related to plaintiff's national origin or race and in most respects are specious. Finally, Weeks had no decisionmaking part in plaintiff's termination.

Because plaintiff failed to present direct evidence that he was terminated due to his national origin or race, the court turns to the familiar *McDonnell Douglas* burden-shifting framework. Under this framework, plaintiff must first establish a prima facie case of national origin/race discrimination by proving that: (1) he is a member of a protected class; (2) he suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected

11

class is treated differently. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). The elements of a prima facie case may vary depending on the facts and context of the particular situation. *See Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

If plaintiff succeeds in establishing his prima facie case, the burden shifts to defendant employer to proffer "legitimate non-discriminatory" reason for its actions. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997). If defendant meets this burden, the burden again shifts to plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *McDonnell Douglas*, 411 U.S. at 804. To do this, plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 537 (3d Cir. 2006) (unreported) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations and other citations omitted)).

Defendant argues that plaintiff has failed to establish the third prong of the prima facie case. While defendant's position has merit, the court sees no need to resolve this

issue. Even assuming arguendo that plaintiff has established a prima facie case, his claim cannot survive summary judgment as defendant has provided a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's temporary employment assignment, and plaintiff cannot point to sufficient record evidence from which a reasonable fact finder could conclude that the reason was a pretext for national origin discrimination.

During the course of the litigation, it appears that plaintiff shifted his theory of pretext from that of alleged bad references to past discrimination by Weeks. While plaintiff argues that defendant's proffered reason for termination, "bad references," is a pretext and lists several "good" references in his response, other than testifying that he received good references, he did not submit them to the court, provided nothing to support his position that he was terminated as a result of bad references, and produced no evidence to rebut defendant's proffered reason for terminating the assignment. Indeed, during his deposition plaintiff testified that he was either given no reason for the termination or told he was no longer eligible to work for defendant.

With regard to Weeks, it is apparent from the evidence of record and from plaintiff's argument that his relationship with Weeks is one no longer embraced by either of them. Regardless, Weeks was not present at the time plaintiff was terminated and had no decisionmaking input in his termination.

Plaintiff also relies upon the DOL's finding that he was discharged without cause. This position is unavailing as defendant was not a party to the unemployment compensation case. Moreover, Adecco (who was a party to the unemployment compensation case) failed to provide information to the DOL regarding the claim.

13

Finally, the record reflects that defendant made its decision to terminate plaintiff only after it became aware of the past relationship between plaintiff, a temporary employee, and Weeks, a permanent employee, including Weeks' fear of plaintiff and her complaint to defendant's Threat Management group. Notably, Weaver, who made the decision to terminate plaintiff's assignment, had never met him and was unaware of his national origin or race.

There is nothing before the court that contradicts the proffered reason for the termination of plaintiff's temporary assignment. Nor is defendant's proffered reason for its action weak, incoherent, implausible, or so inconsistent that a reasonable factfinder could rationally find it unworthy of credence. *See Sarullo v. United States Postal Service*, 352 F.3d 789, 800 (3d Cir. 2003). Even construing the evidence in the light most favorable to plaintiff, he has not provided evidence from which a fact finder could either disbelieve defendant's articulated reason, or believe that a discriminatory reason was more likely than not the cause of the employment action. There is no genuine dispute on the dispositive legal issue, whether defendant had a discriminatory motive. Accordingly, the court will grant defendant's motion for summary judgment.

## V. CONCLUSION

Based upon the foregoing analysis, the court will grant defendant's motion for summary judgment and will deny as moot defendant's motion for order. An appropriate order will issue.